STATE of Delaware,

v.

**Deon WRIGHT, Defendant.**

Superior Court of Delaware, New Castle County.

Submitted: Dec. 11, 2002.

Decided: Jan. 24, 2003.

Paul Wallace, and R. David Favata, Deputy Attorneys General, Department of Justice, Wilmington, for the State.

James D. Nutter, and Raymond D. Armstrong, Office of the Public Defender, Wilmington, for defendant.

SLIGHTS, J.

## I. *INTRODUCTION*

In a truly extraordinary challenge to the Court's inherent power to enforce its orders, manage its affairs and achieve the orderly disposition of its business, the State has taken the position that the Court is without authority to order the production of discovery, including the report from the Office of the Medical Examiner ("ME Reports"), by a date certain in advance of trial. The State argues that no such authority can be found in the Court's rules of criminal procedure and, therefore, the authority does not exist. The Defendant has moved the court to enforce its previous orders compelling the State to produce discovery or face sanctions. For the reasons that follow, Defendant's motion is **GRANTED**.

## II. *FACTS*

After an arrest on July 17, 2002, an indictment was filed in this Court on September 9, 2002 charging the defendant, Deon Wright, with various drug-related offenses including Possession With Intent to Deliver Cocaine. In accordance with the Superior Court New Castle County Case Management Plan ("Case Management Plan"), an Initial Case Review ("ICR") was held on October 15, 2002. To make the process meaningful, the Case Management Plan requires the State to supply automatic discovery, to respond to written Rule 16[1] discovery requests, and to provide a written plea offer to the defendant "within a reasonable time" prior to the ICR.

At the ICR in this case, the presiding judge was advised that the State had not yet produced the ME's Report memorializing its testing of the substance seized from the Defendant. Accordingly, the Court entered a form order requiring the State to produce the ME's Report, and other discovery, on or before November 8, 2002.[2] The Court did not select this date at random. Rather, the Court designated a deadline that fell in sufficient advance of the next event, the Final Case Review ("FCR"), to allow defense counsel to review the results of the testing with Mr. Wright prior to counseling him on whether to accept or reject the State's plea offer. The State did not oppose the order.[3]

On November 18, 2002, ten days after the Court-imposed deadline to produce the ME's Report, the Court conducted the FCR with the expectation that a meaningful discussion could occur with respect to the pending plea offer.[4] No such discussion took place, however, because the State had not complied with the Court's October 15, 2002 order.[5] The Court's effort effectively to manage its criminal docket, and to resolve cases early in the process, at least with respect to this case, was frustrated.

Rather than impose sanctions then and there, the Court provided the State with additional time to produce the ME's report by entering a "Second Discovery Order." In this order, dated November 18, 2002, the Court directed the State to produce the report on or before December 9, 2002 (an additional three weeks). The Court's order also provided that a further default would be grounds for the Defendant to file a "motion to suppress the ME's report" and noted that, if filed, "the court will grant the motion." Again, the State raised no objection to the order.

On December 10, 2002, Mr. Wright filed a "Motion for Sanctions for Failure to

---

1. DEL.SUPER. CT.CRIM. R. 16 ("Rule 16").

2. This form of order has been utilized by the Court at ICRs for at least three (3) years and, to the Court's knowledge, has never been challenged, in substance or in form, until now.

3. The Court will pass over the question of whether the State's silence at the time the orders were entered should operate as a waiver of the challenge it now seeks to mount against the orders. The Court welcomes this opportunity to address the State's challenge to its case management processes on the merits.

4. The State had offered to allow Mr. Wright to plead guilty to the lead charge (Possession With Intent to Deliver Cocaine) in exchange for the State's commitment to dismiss the remaining charges. The State would recommend a sentence of eight (8) years at level V suspended after thirty (30) months for the balance to be served on probation.

5. It is, in the Court's view, reasonable for defense counsel to take the position that he needs to see the ME's report and review it with his client before counseling his client on whether or not to accept a plea to a felony drug charge where the State will be recommending in excess of two years incarceration.

Comply With Discovery Order" in which he recited the procedural history and represented that the State still had not complied with the Court's orders and had not sought any extensions of the Court's deadlines.[6] Putting his finger directly on the Court's motivation for entering the orders in the first place, Mr. Wright argued that "the State's failure to provide discovery as required by the Court's orders has prejudiced the defendant's ability to intelligently weigh the benefits of the current plea offer against the risks of proceeding to trial."[7] He asked the Court to enter an order "prohibiting the State from introducing the ME's report, or any testimony regarding the results of scientific testing, as evidence in the prosecution of this matter." The motion was presented to the Court at a "Routine Criminal Motions Calendar" on December 16, 2002.

At the December 16 hearing, the State offered no explanation for its failure to comply with the Court's prior two orders compelling discovery. Instead, the State challenged the Court's authority to enter the orders in the first place. Specifically, the State argued that Rule 16 does not require the State to perform testing by a date certain or at all for that matter.[8] Accordingly, in the State's view, it may conduct its testing on the eve of trial if it

wishes. And the Court is powerless to compel earlier testing or, correspondingly, earlier production of the reports memorializing the testing.

For his part, the Defendant argued that the State's position effectively would turn the Court's case review process on its head. If the State chose to delay testing for strategic reasons until the eleventh hour, the State could eliminate any reasonable opportunity to resolve cases in advance of trial thereby substantially increasing the number of cases which pass through the Court's pretrial "filters" and languish on the ever-growing trial calendar. The Defendant argued that he had fulfilled his obligation under the Court's November 18 Order by filing this motion so the Court, in turn, should do what it said it would do: "grant the motion."

## III. DISCUSSION

### A. The Inherent Power of the Court

It has been said that courts, when speaking of their inherent powers, have a tendency to employ rhetoric which is "fulsome and talismanic so that the mere statement of the concept becomes a substitute for any analysis of whether its use is appropriate or justified."[9] To avoid dilu-

---

6. By this time, the State had been in possession of the substance seized from the defendant for nearly five months. The Court appreciates the fact that the ME's office is working with limited resources. Nevertheless, it is incumbent upon the State to set priorities for testing of substances in felony drug cases, particularly in cases where a court order compels production by a date certain.

7. Motion at ¶ 4.

8. With respect to "reports of examinations and tests," Rule 16(a)(1)(D) provides: "Upon request of a defendant, the state shall permit the defendant to inspect and copy or photo-

graph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the state, and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial." The State contends that this rule does not require it to produce the ME's report until it receives it, and does not authorize the Court to order production by a date certain.

9. STUMPF, INHERENT POWERS OF THE COURTS—SWORD AND SHIELD OF THE JUDICIARY at 1 (Nat'l Judicial College 1994).

tion of the concept, and the authority which flows from it, Dean Stumpf admonishes the courts to exercise their inherent powers discerningly and only when necessary to preserve the "existence, dignity or functions of the court." [10]

In Delaware, this notion of temperance in the exercise of inherent powers is well-known to our courts. For instance, inherent powers should not be exercised to make a point.[11] On the other hand, it is equally well-settled that the Court may exercise its inherent power "to manage its affairs and to achieve the orderly disposition of its business." [12] The Court's Case Management Plan, and orders entered in furtherance of it, must be deemed proper vehicles of the Court's inherent power in the absence of a suggestion that the Court has failed to consider the right of both the State and the defendant to due and fair process.[13]

■ Contrary to the State's suggestion, the Court's inherent power is not *per se* restricted by the Court's rules of procedure. Indeed, guided by considerations of justice, and "in the exercise of [inherent] powers, [ ] courts may, within limits, formulate procedural rules not specifically re-

quired by the Constitution or the [legislature]." [14] And it would be "ill-advised" for any authority, be it an appellate court or legislative body, "to limit improvidently this inherent power for fear of misuse. The firing point of the legal system is with the trial judge who is best situated to administer the law and protect the rights of all." [15] The trial courts must be given the authority to manage their dockets in a manner which will advance the interests of justice and accommodate and protect all constituencies. This authority to manage dockets necessarily must include the power to issue orders which set deadlines by which the parties must provide information to each other. And when this authority is subverted in one case, the trial court must be empowered to act swiftly and decisively lest the entire system fail.

The Court is compelled to note that the State relies with little grace upon the Court's procedural rules as a basis to attack the Court's authority to issue case management orders. The very rules in which the State showcases its argument recognize the authority of the Court to enter case management orders, even if the orders "modify" or "supplement" the par-

10. *Id.* at 3.

11. *See e.g. State v. Harris,* 616 A.2d 288, 291 (Del.1992) (reversing trial court's exercise of inherent power to dismiss indictment when State failed to secure presence of witnesses for a suppression hearing because trial court did not give the prosecutor an opportunity to explain the default nor did it consider lesser sanctions).

12. *Id.* (citing *State v. McElroy,* 561 A.2d 154 (Del.1989); *Cebenka v. Upjohn Co.,* 559 A.2d 1219 (Del.1989); *Wahle v. Medical Center of Delaware,* 559 A.2d 1228 (Del.1989)). *See also Duncan v. Slattery,* 782 A.2d 263, 2001 Del. Lexis 368, at *4 (2001) (ORDER)(stating that power to dismiss action for want of prosecution is inherent "arising from the control necessarily vested in the [trial] court to man-

age its own affairs and to achieve the orderly and expeditious disposition of its own business").

13. *Cf. Harris,* 616 A.2d at 292 (asserting that exercise of inherent power improper where court failed to consider the "State['s] . . . important stake in criminal proceedings").

14. *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). *See also United States v. McSherry,* 226 F.3d 153, 156 (2d Cir.2000) (explaining that the court's "[inherent] power is not impliedly preempted or extinguished by a procedural rule that covers some of the same ground.")

15. *United States v. Cannone,* 528 F.2d 296, 298 (2d Cir.1975).

ties' obligations under the rules.[16] This is precisely what the Court did in this case when it ordered the State to supply the ME's Report by a date certain. While not specifically addressed by the Court's criminal rules, the substance of the discovery orders issued in this case was not prohibited by them either.

## B. The Court's Inherent Power Was Exercised Properly In This Case

■ Criminal filings in this Court have increased in each of the past three years. In 2002, criminal filings were up by 10.6% over the previous year. The Court's resources, on the other hand, with luck, remain the same year-to-year. Without luck, when vacant support staff positions go unfilled, resources decrease. Yet all the while, the defendants charged with crimes in this Court are entitled to a just and speedy disposition of their cases.[17] And the judges of this Court are charged with the ultimate responsibility of ensuring that the right to speedy trial is protected for all concerned (victims and defendants alike).[18] Of course, the Court shares this responsibility with the State: "The 'unquestioned duty to implement the right to a speedy trial' should be felt by the prosecutor's office and no less lightly by the judges." [19]

To accomplish the just and speedy disposition of cases, the Court's Case Management Plan offers the parties at least two court-facilitated opportunities to reach a negotiated resolution of the case short of trial. The success of the case review process is predicated on certain key assumptions, the primary one being that the State and the defendant have exchanged the information that each requires to evaluate the strengths and weaknesses of the case and to discuss potential plea arrangements meaningfully and intelligently with their respective clients or constituencies.[20] Plea agreements facilitated by case reviews and similar pretrial proceedings resolve, on average, more than 90% of the Court's pending cases in a given calendar year. Without the case review process, or some other process to resolve pending cases prior to the eve of trial, the Court would be left with a refractory trial calendar, unresponsive to any efforts of the Court to manage it.

When the State, through its actions or inactions, subverts the Court's ability to manage its docket, the Court must respond with sanctions. By failing timely to produce the ME's report in this case, the State reduced the case review process to a meaningless exercise and unfortunate waste of precious (and scant) resources. The defendant is entitled— if he wishes— to review the ME's report before being called upon by the Court to decide whether to plead guilty to a major drug offense. When the Court ordered that production of the ME's report occur before the FCR, everyone involved in the system, including the prosecutor, knew full well why the Court chose that deadline. Rather than support the system, and commensurately the speedy disposition of criminal cases, as it is obliged to do, the

---

16. DEL.SUPER. CT.CRIM. R. 57(b).

17. *See generally Middlebrook v. State,* 802 A.2d 268 (Del.2002).

18. *Id.* at 275.

19. *Id.*

20. Other key assumptions are that the attorneys involved in the case will be present or available to participate in negotiations and that the parties will not be afforded the opportunity to delay negotiations until the eve of trial without good cause.

State chose to ignore the Court's orders altogether and without explanation. In response, the Court imposed a measured sanction: exclusion of the evidence the State had been compelled to produce.[21]

## IV. CONCLUSION

The Court has developed a process by which it manages its criminal docket to effect speedy and fair justice. The system is not perfect and sometimes, despite best efforts, it fails. "And, while it is proper that people should find fault when their judges fail, it is only reasonable that they should recognize the difficulties."[22] In this case, the defendant has not been offered a meaningful opportunity to consider the plea offer which has been extended to him by the State. The Court's process, then, has failed, at least to the extent it seeks to afford opportunities to resolve cases in advance of trial. In this instance, however, the failure flows not from a lack of diligence by any judge, but rather from the State's inexplicable decision to disregard a court order. The Court's inherent power to manage its affairs is properly triggered in this circumstance, and the exercise of that power in this case was reasonable.

The Defendant's motion for sanctions for failure to comply with discovery order is **GRANTED**. The State shall be precluded at trial from introducing any evidence and/or opinions from the Office of the Medical Examiner or any other expert regarding the weight or chemical composition of the substances seized from the Defendant.

**IT IS SO ORDERED.**

---

**21.** The sanction is all the more reasonable in this case because the State was aware at the time the order was entered what the sanction for noncompliance would be. Specifically, the order clearly stated that the Court would "suppress" the ME's report if it was not produced by December 9, 2001.

**22.** LEARNED HAND, THE SPIRIT OF LIBERTY, at 110 (Knopf 1st Ed.1952).